NICHOLAS P. CARL and BETTY CARL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Carl v. Commissioner
Docket No. 2673-77.
United States Tax Court
T.C. Memo 1981-202; 1981 Tax Ct. Memo LEXIS 536; 41 T.C.M. (CCH) 1346; T.C.M. (RIA) 81202; April 27, 1981. *536 1. Respondent's determination of unreported taxable income approved, with certain exceptions. Cash on hand at the beginning of the period in issue determined by the Court. 2. Respondent carried his burden of proving that a part of the underpayment of tax required to be shown on petitioners' returns for the years 1969, 1970, and 1971 was due to fraud and that the returns were false and fraudulent with the intent to evade tax. Statute of limitations is no bar and fraud addition to tax approved. Daniel C. Ertel, for the petitioners. Bradford A. Johnson, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: In a statutory notice of deficiency mailed to petitioners on December 21, 1976, respondent determined the following deficiencies in, and additions to, petitioners' Federal income tax. Taxable
year ended
Addition to tax [1]
Dec. 31,
Deficiency
sec. 6653(b), I.R.C. 1954
1969
$ 10,148.20
$ 5,074.10
1970
11,062.86
5,531.43
1971
12,489.98
6,244.99 Respondent, using the bank deposits and cash expenditures method of reconstructing *537 income, determined the foregoing deficiencies principally as a result of the underlying determination that the petitioners had understated income in the following amounts on their returns for the years involved: [2]
Year
Amount
1969
$ 45,635.18
1970
40,414.24
1971
38,970.69
The issues for our decision in this case are: (1) Whether, and to what extent, petitioners improperly understated gross income from their return in each of the years in issue; (2) whether any such understatements were due to fraud with intent to evade tax on the part of petitioner Nicholas P. Carl; sec. 6501(c); [3] (3) whether, if any understatements for 1969 and 1970 were not due to fraud, they were in excess of 25 percent of the gross income shown on the returns for those 2 years; sec. 6501(e)(1); [5] *538 and (4) whether petitioners are liable for section 6653(b) additions to tax. Any assessments for 1969 and 1970 are barred by the statute of limitations unless issues (2) and/or (3) can be answered affirmatively. Any assessment for 1971 is barred unless issue (2) can be answered affirmatively. [5]
FINDINGS OF FACT Some of the facts were stipulated and they are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioners Nicholas P. Carl (hereinafter Carl) and Betty Carl, husband and wife, resided in Kingston, N.Y., when they filed their petition herein. For the taxable years in issue, petitioners timely filed joint Federal income tax returns with the Andover Service Center, Andover, Mass.
General Information
During the years 1969 through 1971, Carl owned a 50-percent interest in a partnership which owned a 4-unit apartment building in Port Ewen, N.Y. Carl reported income from this partnership of $ 335.40 for 1969. Ownership of the partnership interest was not reflected on the returns filed for 1970 and *539 1971 and no income or loss was reported with regard to that interest. [6]
During the years 1969 through 1971, Carl owned a 4-unit apartment building located in Kingston, N.Y., which he had purchased in 1946. Carl reported the following with regard to this building: 1969
1970
1971
Gross rents
$ 1,420.00 $ 1,740.00 $ 1,740.00 Depreciation
(396.50)
(396.50)
(131.08)
Other expenses
(860.87)
(893.21)
(856.23)
Income
162.63 450.29 752.69 During the taxable years 1969 through 1971, Carl maintained two brokerage accounts at the First Albany Corp., Albany, N.Y., through which he conducted various stock transactions. Carl first opened a brokerage account at the First Albany Corp. in October 1965, and he conducted various stock transactions thereafter. Petitioners also maintained the following bank accounts: Bank
Type
Ownership
Kingston Trust Company
Acct. No. 1026689
Checking
Carl
Acct. No. 4164505
Checking
Joint
Heritage Savings Bank
Acct. No. 57-370
Savings
Joint
No. 2142
Certificate
Carl in
of Deposit
Trust for
his wife
National Bank of Orange
Unnumbered
Carl
and Ulster Counties
Certificate
of Deposit
*540 Petitioners never withdrew amounts from one account for redeposit in another and they seldom wrote checks to cash. Petitioners also had a safe deposit box at the Kingston Trust Co. On February 11, 1968 Carl borrowed $ 4,200 from the Kingston Trust Co. This loan was repaid on May 21, 1968. On May 21, 1968, Carl made a noninterest-bearing loan of $ 2,500 to a Charles Farley. This loan was repaid by Farley in three installments--$ 1,500 on December 28, 1968; $ 500 on June 1, 1969; and $ 500 on January 2, 1970. In 1969, petitioners took a 2-week trip to Portugal and Spain, and in 1971 petitioners took a cruise to Bermuda. Petitioners did not receive gifts, inheritances, or insurance proceeds in large amounts prior to or during the taxable years in issue. Carl purchased U.S. Savings Bonds during the period 1943 through 1953. Between 1952 and 1973, Carl redeemed the savings bonds. [7] Carl's earnings *541 for the years 1949 through 1971 were subject to FICA taxes. The maximum earnings subject to these taxes and Carl's earnings for the years 1949 through 1971 reported by Carl's employers are set forth in the following schedule: Maximum Earnings
Earnings Reported
Subject to
to Social Security
Year
Social Security
Administration
By Employer
Total
1949
$ 3,000.00
$ 206.00
1950
3,000.00
$ 555.74)
787.27
188.54)
42.99)
1951
3,600.00
42.75)
2,184.52
29.08)
122.50)
1,595.24)
394.95)
1952
3,600.00
3 ,600.00)
4,929.64
587.14)
742.50)
1953
3,600.00
3,140.78)
5,299.66
2,158.88)
1954
3,600.00
250.92)
5,180.15
2,384 .73)
5,526.00)
18.50)
1955
4,200.00
4,200.00)
6,881.70
2,681.70)
1956
4,200.00
4,200.00)
7,182.79
2,982.79)
1957
4,200.00
2,051.74)
6,508.01
1,075.42)
3,380.85)
1958
4,200.00
12.00)
4,212.00
4,200.00)
1959
$ 4,800.00
$ 4,800.00
1960
4,800.00
4,800.00
1961
4,800.00
$ 4,800.00)
6,300.00
1,500.00)
1962
4,800.00
4,800.00
1963
4,800.00
819.72)
4,709.53
3,889.81)
1964
4,800.00
41.07)
4,800. 00
4,758.93)
1965
4,800.00
3.45)
4,800.00
4,796.55)
1966
6,600.00
1.38
1967
6,600.00
1968
7,800.00
1,964.00
1969
7,800.00
3,507.00
1970
7,800.00
7,170.00
1971
7,800.00
7,028.00
Retreat Restaurant
Carl's principal business activity during the years 1969 through 1971 involved owning and operating, as a sole proprietorship, *542 the Retreat Restaurant (hereinafter Retreat) in Kingston, N.Y. Carl purchased the Retreat in 1963 for $ 35,000, consisting of a downpayment of $ 10,000 and a mortgage for the $ 25,000 balance. The $ 10,000 consisted of: (a) $ 2,000 - Personal check drawn on petitioners' checking account. (b) $ 4,000 - Loan from the Kingston Trust Co; and (c) $ 4,000 - Liquid assets. Included somewhere in the $ 10,000 downpayment was $ 1,000 loan Carl received in 1963 from Charles Farley for the purchase of the Retreat. This loan was repaid within 1 year of its receipt. On February 1, 1963, Carl filed a Statement of Finance with the State of New York Liquor Authority in connection with his application for a liquor license for the Retreat. Carl included therein the following list of assets and liabilities: Assets
Amount
(a) Mortgage loan - Retreat
$ 25,000
(b) Money deposited with
2,000
Sellers of Retreat
(c) Checking account
4,000
(d) Bank loan
4,000
(e) Series E savings bonds
400
(f) Stocks and bonds
2,400
(g) Life insurance surrender value
400
(h) Automobile
1,100
(i) One-half interest in property
owned by partnership
15,000
(j) Rental property
12,000
$ 66,300
Liabilities
(a) Mortgage loan- Retreat
25,000
(b) Partnership property mortgage
3,860
(one-half)
(c) Rental property mortgage
1,371
(d) Bank loan
4,000
$ 34,231
*543 In a financial report prepared by an investigator for the State of New York Liquor Authority which accompanied Carl's liquor license application, it was stated that the source of the $ 2,000 money deposit and the $ 4,000 checking account balance was cash which Carl had "kept at home in a safe and accumulated over a period of years. Mr. Carl stated that this cash was kept at home for him to use for investment purposes." The underlying business records for the Retreat were kept personally by Carl and consisted of check stubs documenting expenses paid by check and a day book in which were recorded the restaurant's cash receipts and disbursements. The figures used for cash receipts were taken from cash register tapes, which tapes Carl destroyed after he recorded the figures in the day book. Once a week Carl deposited the majority of the Retreat's daily cash receipts in the Kingston business checking account. He retained approximately $ 100 for personal expenses, which amount was generally deposited in the Kingston personal checking account. Carl never compared the sum of bank deposits and retained gross receipts with the figures shown on the cash register tapes or in the day book. During *544 the years 1969 through 1972, Carl employed an accountant, Francis Kugelman (hereinafter Kugelman), to maintain the Retreat's formal books and records. Kugelman transcribed all the figures from the day book and from check stubs into a formal set of books. If properly kept, the records used for the Retreat were sufficient for the Retreat's type of business. In addition to keeping the Retreat's formal records, Kugelman prepared petitioners' Federal and New York State income tax returns for the years in issue. In connection therewith, Carl supplied to Kugelman the following records: Day books, check stubs, forms 1099, a sheet of paper listing expenses (including those pertaining to Carl's partnership interest), and a sheet of paper listing stock transactions. On the returns filed for 1969, 1970, and 1971, petitioners reported the following items and amounts of gross income: 1969
1970
1971
Dividends
$ 626.53
$ 2,638.90
$ 1,266.27 Interest
1,142.66
624.80
2,892.89 Gross business receipts
101,252.05
97,004.68
100,059.50 Short-term capital gain
3,102.01
1,106.84
787.66 Long-term capital gain
4,441.16
542.93
(3,840.87)
Rent
1,420.00
1,740.00
1,740.00 Partnership income
335.40
112,319.81
103,658.15
102,905.45  On *545 petitioners' returns for the years 1966-1972, the following items were reported concerning the Retreat: 1966
1967
1968
1969
Gross business
receipts
$ 74,631.82 61,922.-- 87,532.17 101,252.05 Cost of goods
sold
(65,781.77)
(30,568.82)
(52,020.07)
(58,279.27)
Gross profit
8,850.05 31,353.-- 35,512.10 42,972.78 Other Expenses
(15,949.46)
(35,706.--)
(33,548.28)
(39,466.75)
Net profit [1]
$ (7,099.41)
$ (4,352.95)
$ 1,963.82 $ 3,506.03 1970
1971
1972
Gross business
receipts
97,004.68 100,059.50 107,231.00 Cost of goods sold
(55,902.62)
(60,937.59)
(60,012.04)
Gross profit
41,102.06 39,121.91 47,218.96 Other Expenses
(33,932.40)
(32,094.15)
(35,028.81)
Net profit [1]
$ 7,169.66 $ 7,027.76 $ 12.190.15 Adjusted gross income reported by petitioners was $ 8,552.34 for 1969, $ 9,684.17 for 1970, and $ 10,694.11 for 1971. N.Y. State Audit
In 1972 petitioners' New York State income tax returns for 1969, 1970, and 1971 were audited. Only minor discrepancies were found between the cash receipts shown in the Retreat's books and records and the amounts reported on the returns. When an examination of petitioners' records *546 revealed the existence of a previously undisclosed bank account, State auditors began an analysis of petitioners' "cash flow" during the years involved. The initial findings of this analysis were that the amounts shown on petitioners' income tax returns were insufficient to provide the quantity of funds which "flowed" through petitioners' hands during the years involved. Accordingly, it was concluded that petitioners had substantially understated their income for each of 1969, 1970, and 1971. In response to the initial findings by the State auditors, Carl and Kugelman prepared explanation sheets for each of the 3 years on which were listed various specific nontaxable sources of cash for specific dollar amounts. For example, listed on the sheets were amounts identified as having been loaned by Carl in prior years and as having been repaid in the year in question, thereby allegedly providing Carl with nontaxable cash during the year in question. The purpose for preparing these lists was to establish nontaxable sources of cash which would explain "cash-flow" amounts in excess of cash generated by the Retreat and the other taxable sources listed in petitioners' returns. Carl's list *547 of specific nontaxable sources of cash totaled $ 40,412.99 for 1969, $ 26,584.37 for 1970, and $ 24,371.24 for 1971, but did not, however, totally explain the unreported income amounts determined by the State auditors. As explanation for the "excess" amounts, the following general statement was attached to the specific lists: Since 1956, Mr. and Mrs. Carl have been living with Mr. Carl's father, who owns the property on 12 Wrentham Street. The Carl's have been receiving free rent during this period. With no housing expense, Mr. Carl has been able to accumulate significant cash holdings during the fifteen year period, approximately $ 1,200 per year. In addition, Mr. Carl sold his former business in June 1960 to George Shulfeldt for the sum of $ 6,000. This also was maintained in cash until deposited in his savings account or invested in the stock market upon my [Kugelman's] recommendation. Mr. Carl also accumulated the sum of $ 6,500 from his investments during the past ten years. This expains for [sic] the understatement [sic] adjusted gross receipts amount [sic] for 1969, 1970, and 1971 of $ 38,836.17, of which $ 30,500 was cash holdings resulting from the aforementioned transactions. *548 [8]
Carl did not provide the New York State authorities with any evidence to substantiate either the existence or sources of any accumulated cash. Although the N.Y. State auditors characterized Carl as being cooperative during the audit, Carl did not voluntarily reveal to them the existence of all of petitioners' bank accounts and certificates of deposit, nor did the auditors discover them. In addition, Carl never made specific mention of the existence of a cash hoard in the amount of $ 125,000. Ultimately, the question of petitioner's liability for additional New York State income tax was settled by compromise, pursuant to which petitioners agreed that they had additional business income *549 in the amounts of $ 29,063.28 (1969), $ 27,907.98 (1970), and $ 23,591.87 (1971). Reconstruction of Income
As previously noted the deficiencies in, and additions to, tax set forth in the statutory notice were principally based on respondent's determination that petitioners had omitted income from their returns for each of the years and that such omissions were fraudulent. This income was identified as being unreported gross receipts of the Retreat. [9] Respondent determined the amount of the omissions by use of the bank deposits and cash expenditures method of reconstructing income. During the course of the audit, Carl only voluntarily disclosed the existence of one checking account, one savings account, and one certificate of deposit. The specific omitted gross receipts were determined as follows: 1969
1970
1971
Bank deposits
$ 161,334.76 $ 138,751.03 $ 199,896.73 Currency and
29,350.81 17,802.22 35,487.75 other expenditures
190,685.57 156,553.25 235,384.48 Nonincome deposits
(43,798.34)
(19,134.33)
(96,354.29)
and items
Total gross receipts
146,887.23 137,418.92 139,030.19 Gross receipts per
returns
(101,252.05)
(97,004.68)
(100,059.50)
Omitted gross
45,635.18 40,414.24 38,970.69 receipts [10]
*550 The total bank deposits made to various bank accounts maintained by petitioners were: Bank
1969
1970
1971
Kingston Trust Co.
Acct. No. 1026689
$ 92,034.73
$ 98,284.72
$ 97,811.72
Acct. No. 4164505
7,947.75
6,517.89
7,883.68
Heritage Savings Bank
Acct. No. 57-370
54,352.28
33,948.42
44,201.23
C.D. No. 2142
50,000.00
National Bank of
Orange and
Ulster Counties
7,000.00
161,334.76
138,751.03
199,896.73
Account No. 1026689 in the Kingston Trust Co. was the Retreat's checking account and deposits made into it were generally on a weekly basis. These deposits contained the majority of the Retreat's gross receipts which were deposited. The second account in Kingston Trust Co., account No. 4164505, was petitioners' personal checking account and deposits made into it were also generally on a weekly basis. These deposits, which for the most part were each between $ 50 and $ 200, contained gross receipts of the Retreat which Carl retained for personal expenditures and amounts provided by Carl's father. Account No. 57-370 in Heritage Savings *551 Bank was the account through which Carl conducted many of his stock transactions. Deposits to this account were generally in large amounts and they usually were made in cash or with amounts paid to Carl as a result of stock transactions. The dates and amounts of the deposits are as follows: 1969
Jan. 9
$ 8,160.12
Mar. 26
n1 3,000.00
Apr. 30
600.00
June 20
n1 3,000.00
July 14 [11]
n1 4,000.00
Aug. 8
n1 3,000.00
Sept. 11
n1 5,000.00
Sept. 23
7,265.33
Oct. 23
8,113.96
Nov. 28
12,212.87
$ 54,352.28
1970
Jan. 5
n1 $ 3,750.00
Feb. 27
1,120.85
Mar. 19
n1 3,000.00
Apr. 9
n1 2,000.00
Apr. 9
94.00
May 4
n1 3,000.00
May 21
n1 2,200.00
June 1
n1 2,000.00
June 15
n1 3,200.00
June 26
3,144.73
July 3
n1 1,500.00
July 13
n1 2,500.00
Aug. 14
n1 4,000.00
Oct. 21
2,438.45
$ 33,948.03
1971
Jan. 12
n1 $ 5,500.00
Jan. 12
7,811.71
Mar. 10
2,796.69
Mar. 16
4,366.41
Mar. 26
2,574.01
Apr. 16
3,071.18
Apr. 26
9,487.03
May 7
5,594.30
Aug. 31
n1 3,000.00
$ 44,201.33
The $ 50,000 entry for C.D. No. 2142 in Heritage Savings Bank was the purchase of a $ 50,000 certificate *552 of deposit in July 1971. Similarly, the $ 7,000 entry for an account in the National Bank of Orange and Ulster Counties was the purchase of a $ 7,000 certificate of deposit in May 1969. The $ 50,000 used to purchase C.D. 2142 was determined to be from a nonincome source and $ 2,000 of the $ 7,000 used to purchase the C.D. at the National Bank of Orange and Ulster Counties was determined to be from a nonincome source (see table following). During the years at issue, petitioners made the following currency and other expenditures: Currency
Expenditures
1969
1970
1971
Business
Expenditures
$ 7,315.18
$ 6,161.13
$ 4,623.71
Kingston Trust Co.
Treasurer's checks
Purchased
22,035.63
10,630.45
25,412.62
Heritage Savings
Bank Cashier
Check Purchased
5,451.42
Other
Expenditures
Unidentified Payment
to First Albany Corp.
(December 14, 1970)
1,010.64
Total Currency and
Other Expenditures
$ 29,350.81
$ 17,802.22
$ 35,487.75
In his reconstruction-of-income computation, respondent did not include any amount for cash expended for personal living expenses. Carl purchased the treasurer's and cashier's checks in the following amounts on the following dates: 1969
Mar. 19
$ 14,200.00
July 7
1,164.88
Nov. 5
3,924.50
Nov. 17
2,746.25
22,035.63
1970 *553 Mar. 1
2,917.76
Sept. 21
4,624.81
Nov. 5
3,087.88
10,630.45
1971
Feb. 2
2,550.00
Mar. 2
4,000.00
May 21 [1]
5,451.42
June 14
5,449.58
July 15
911.32
July 27
1,733.00
Aug. 16
3,101.63
Aug. 31
4,544.25
Oct. 7
747.13
Nov. 15
1,416.64
Dec. 2
959.07
30,864.04
These purchases were made with cash that could not be traced back to any bank account. The nonincome deposits and items excluded in respondent's computation were as follows: Nonincome deposits
1969
1970
1971
Kingston Trust Co.
Acct. No. 1026689
$ 500.00
$ 4,099.49
$ 1,039.15
Heritage Savings Bank
Acct. No. 57-370
35,752.28
6,978.42
34,701.33
Acct. No. 2142
50,000.00
National Bank of
Orange and Ulster
Counties
2,000.00
Total nonincome
deposits
38,252.28
10,897.91
85,740.48
Nonincome Items
Currency for deposit
First Albany Corp.
Check (May 10, 1971)
3,107.62
Returned checks
137.00
240.00
125.50
Sales tax collected
and deposited
3,037.30
3,317.52
4,374.42
Dividends reported
626.53
2,638.90
1,266.27
Interest income
reported and deposited [12] *554 325.23
300.00
Rental receipts
1,420.00
1,740.00
1,740.00
Total nonincome items
5,546.06
8,236.42
10,613.81
Total nonincome
deposits and items
43,798.34
19,134.33
96,354.29
The nonincome deposits were amounts for which respondent could specifically identify nontaxable sources. The nonincome items are amounts which respondent could identify as nontaxable because of their nature or as amounts which were accounted for on petitioners' returns. Distillation of the foregoing facts shows that respondent was unable to ascertain the sources of funds for: (1) Cash deposits made to petitioners' savings account in the Heritage Savings Bank; (2) $ 5,000 in cash used to purchase in part a $ 7,000 certificate of deposit (the remaining $ 2,000 of which was traceable to a nontaxable source); (3) cash expended for treasurer and cashier checks; and (4) a single payment to Carl's stockbroker in 1970 for which the mode of payment could not be ascertained. These various items total: 1969
1970
1971
Bank deposits
$ 18,000.00
$ 27,150.00
$ 8,500.00
C.D.
5,000.00
Payment to stockbroker
1,010.64
Check purchases
22,035.63
10,630.45
30,864.04
45,035.63
38,791.09
39,364.04 These total amounts approximate *555 the omitted income amounts determined by respondent: 1969
1970
1971
Omitted income
$ 45,635.18
$ 40,414.24
$ 38,970.69
The sources of the remaining bank deposits and other currency expenditures are traceable to reported gross receipts and other income amounts, interaccount transfers, loans, or payments from Carl's stock brokerage accounts. A chronology of the bank deposits in cash and other cash expenditures for which sources could not be ascertained is as follows: 1969
Date
Amount
Form [1] *556 Mar. 19
$ 14,200.00
TC
Mar. 26
3,000.00
BD
May 28
5,000.00
CD
June 20
3,000.00
BD
July 7
1,164.88
TC
July 14
4,000.00
BD
Aug. 8
3,000.00
BD
Sept. 11
5,000.00
BD
Nov. 5
3,924.50
TC
Nov. 17
2,746.25
TC
45,035.63
1970
Jan. 5
3,750.00
BD
Mar. 1
2,917.76
TC
Mar. 19
3,000.00
BD
Apr. 9
2,000.00
BD
May 4
3,000.00
BD
May 21
2,200.00
BD
June 1
2,000.00
BD
June 15
3,200.00
BD
July 3
1,500.00
BD
July 13
2,500.00
BD
Aug. 14
4,000.00
BD
Sept. 21
4,624.81
TC
Nov. 5
3,087.88
BD
Dec. 14
1,010.64
[2]
38,791.09
1971
Jan. 12
$ 5,500.00
BD
Feb. 2
2,550.00
TC
Mar. 2
4,000.00
TC
May 21
5,451.42
CC
June 14
5,449.58
TC
July 15
911.32
TC
July 27
1,733.00
TC
Aug. 16
3,101.63
TC
Aug. 31
4,544.25
TC
Aug. 31
3,000.00
BD
Oct. 7
747.13
TC
Nov. 15
1,416.64
TC
Dec. 2
959.07
TC
39,364.04
ULTIMATE FINDINGS OF FACT Carl understated gross receipts of the Retreat and adjusted gross income on petitioners' returns for each of the years 1969, 1970, and 1971, which resulted in underpayments of tax. The understatements of income were willfully made by Carl in an attempt to evade tax and the underpayments of tax were due to fraud on the part of Carl for each of the years 1969, 1970, and 1971. Petitioners had cash on hand as of December 31, 1968, in the amount of $ 15,000 which was deposited in banks or used for cash expenditures during the years 1969, 1970, and 1971. OPINION The issues in this case center around whether petitioners improperly understated income on their returns for each of the years in issue and, if so, whether the understatements were the result of a fraudulent intent to evade tax on the part of Carl. Understatements of Income
Petitioners have the burden of showing error in respondent's deficiency determinations. Rule 142(a), Tax Court Rules of Practice and Procedure.
By analyzing petitioners' bank deposits and cash expenditures, respondent determined that petitioners had understated their income by $ 45,635.18, $ 40,414.24, *557 and $ 38,970.69, respectively, in 1969, 1970, and 1971. The specific computation and items involved are set forth in the Findings of Fact. In general terms respondent determined how much cash had flowed through petitioners' hands in each of the years in question; he then determined how much of it could be accounted for by income reported on petitioners' returns from all sources and by eliminating repayments of loans, redeposits, and cash flow from any other nontaxable sources he could find or that were pointed out to him and verified by petitioners. In doing so he carefully analyzed petitioners' bank accounts, the books and records of Carl's business, the Retreat tavern, and Carl's stock brokerage account, to determine where possible the source of the funds that were deposited in the banks and were used for other cash expenditures, and what the funds that were withdrawn from the bank accounts were used for. He then determined that the excess of the bank deposits and cash expenditures over the cash receipts that could be accounted for was from unreported gross receipts from Carl's business or from Carl's gambling activities, both of which were taxable income. In making his determination, *558 respondent did not add any amounts for the inevitable cash expenditures for personal living expenses and, if there was some indication that a particular expenditure had a nontaxable source, he resolved any question with regard thereto in petitioners' favor. Additionally, respondent took into consideration the items listed on the sheets Carl submitted to the N.Y. State auditors and he made what he thought to be appropriate adjustments therefor. In sum, respondent performed a detailed examination of petitioners' financial transactions during the years in issue. Petitioners do not dispute respondent's authority to use the bank deposits method of proof, nor do they point to a specific deposit or expenditure as having a nontaxable source and, therefore, improperly included in respondent's determination. Petitioners also do not dispute the facts that many transactions were conducted by Carl in cash and that the gross business receipts reported on petitioners' returns and the other sources of funds with regard to which there is no dispute were insufficient to generate the funds which petitioners had available and expended. On brief, petitioners rely almost entirely on the argument that *559 the understated "income" amounts determined by respondent were not income at all but had as their source a cash hoard which petitioners and Carl's father had accumulated over many years by saving wages, insurance awards, sales proceeds of real estate and personal property, and wedding gifts. Petitioners claim that they and their children lived frugally in a home owned by Carl's father; that the father did not disclose to others his financial affairs and that he kept his savings in his home and did not otherwise invest or deposit them; that petitioners' savings were comingled with the father's and, in effect, controlled by the father; and that it was only beginning shortly before and during the years in issue that Carl was able to convince his father that the cash hoard should be invested or deposited in savings accounts. Petitioners also argue that Carl's business, the Retreat, could not have produced all of the additional gross receipts determined by respondent, that Carl had no gambling income to speak of, and that the unidentified deposits and cash expenditures could not have emanated from a taxable source in the years before us. Based on the record as a whole, we have concluded *560 that although petitioners may have had as much as $ 15,000 cash on hand at the end of 1968, petitioners have failed to sustain their burden of proving that respondent's determination that the remainder of the unexplained cash expenditures was taxable income to petitioners was erroneous. The evidence is woefully inadequate to prove that petitioners could have or did accumulate the $ 125,000 amount claimed or anything close to that amount. The only evidence offered to support petitioners' cashhoard claim was Carl's vague and general testimony. During that testimony, in addition to asserting that petitioners lived frugally and thus were able to save, Carl also identified specific one-time events which he claimed were sources of cash included in the cash hoard. These included, for example, cash wedding gifts of $ 12,000 from petitioners' marriage in 1956, proceeds from the sale of a boat, and repayments of loans by his three sisters. No testimony or documents were offered, however, either to substantiate Carl's general testimony as to existence of a $ 125,000 cash hoard or to verify the occurrence of those specific events which Carl identified as sources of cash included in the cash *561 hoard. Carl's three sisters lived in Kingston and none of them was called as a witness. The evidence of Carl's minimal taxable wages for the years prior to those in issue, see pp. 5-7, infra, evidence which petitioners do not dispute, makes it difficult to believe that petitioners could have accumulated a substantial cash hoard from wages. Similarly, the net profit amounts reported for the Retreat for the years prior to 1969 do not appear sufficient to allow for the accumulation of any cash hoard therefrom. In addition, there were so many inconsistencies in Carl's testimony that it is hard to believe any of it. When asked why he borrowed money at interest when he had so large an amount of cash available, Carl usually retreated into the shadow of his father, whom he said told him never to spend his own money but to use other people's money, and who, according to Carl, would not let him invest or bank any of the cash hoard until 1969. This is inconsistent with the fact that Carl started playing the stock market on a fairly sizeable scale in 1965 and continued such activity thru the years here involved. Petitioners offered no evidence of the father's income or assets. But despite *562 Carl's testimony that he banked, invested, or spent "their" cash hoard in the years here involved, Carl testified that when his father died in December of 1974 his estate, mostly in cash, was worth approximately $ 140,000 to $ 150,000, excluding the house in which they lived. [13] Carl offered no explanation of why his father pooled all of his assets with Carl to the apparent exclusion of his three sisters. Other damaging evidence to Carl's claim that the unexplained cash expenditures were made from a cash hoard accumulated prior to 1969 rather than from taxable income received in 1969-1971 is the financial statement Carl filed with the New York State Liquor Authority in 1963 when he sought a liquor license for the Retreat, and the settlement of his income tax liability to the State of New York for the same years here involved. In his statement filed with the Liquor Authority he reported only $ 6,000 in cash of his own, saving bonds having a value of $ 400, and stocks and bonds valued at $ *563 2,400. During the audit of his New York State income tax for these years, which took place in 1972, Carl did not mention a cash hoard of anything like $ 125,000. Furthermore, he settled this matter on the basis that petitioners had additional business income in the amounts of $ 29,063.28 for 1969, $ 27,907.98 for 1970, and $ 23,591.87 for 1971. This was done while Carl's father was still living and presumably could have supported a claim that the unexplained cash receipts were from a cash hoard that he and Carl had accumulated over the years. In addition to the inconsistencies in Carl's testimony, petitioners offered no concrete evidence to support any of Carl's explanations of the sources of the unexplained deposits. Without proof that petitioners had a sizable cash hoard on hand, petitioners have no defense to respondent's determination that petitioners understated their taxable adjusted gross income for each of the years before us in the amounts of the unexplained deposits and cash expenditures. While respondent's evidence is strong and petitioners' evidence is weak, there are several factors that convince us that petitioners must have had some cash on hand at the beginning *564 of 1969 that was probably deposited or used during the years before us and would provide a nontaxable source of income, for the years before us. Carl was engaged in considerable stock market activities from 1965 forward and he must have had some funds to invest. We realize that respondent has eliminated as nonincome deposits over $ 35,000 of the deposits in the Heritage stock transaction account for the year 1969, and that petitioners have not taken issue with this figure, but we have no explanation of what made up the $ 35,000 or when it was deposited. [14] An opening net worth statement would have been helpful. Also cash in the amount of $ 14,200 was utilized to purchase a treasurer's check on March 19, 1969, and there were fairly numerous deposits of cash in even thousands of dollars in each of the years before us, which suggests that it might have come from a hoard of cash rather than everyday receipts. And finally, it seems quite unlikely to us that the Retreat, the only known source of taxable income to petitioners during these years, could either have generated so large an additional cash flow in the years before us, or could have generated so much more income in 1969, 1970, *565 and 1971 than it appears to have generated in the preceding years. [15] While we realize that petitioners did not buy the Retreat until 1963, we think it is reasonable to assume that its growth in net profits would have been steadier or more gradual than the sudden increase in net profit that has been attributed to it by respondent for the years 1969, 1970, and 1971. In other words we surmise that there could have been unreported gross receipts from prior years that may have been on hand at the beginning of 1969. While we do not condone past wrongdoings we have jurisdiction in this case only to determine the correct tax liability for the years before us. We have used our best judgment, based on the evidence before us, and learning most heavily on petitioners who had the burden of proof, in concluding that petitioners had $ 15,000 cash on hand at the beginning of 1969 which was used for bank *566 deposits or cash expenditures during the years before us. We direct the parties to allocate this amount in a reasonable manner in Rule 155 computations. Fraud
The issue of fraud is important in this case in two respects. Absent a showing of fraud for each of the years (or a showing of a 25-percent omission for 1969 and 1970), the statute of limitations under section 6501(a) bars any assessment of any deficiency. In addition, the question of fraud is important because of respondent's determination that additions to tax for fraud are applicable to each of the years. Sec. 6653(b). Section 6501(c)(1) provides: [16] *567 In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time. Section 6653(b) provides in pertinent part: If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on any return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. Respondent has the burden of proving fraud by clear and convincing evidence. Steiner v. Commissioner, 350 F.2d 217 (7th Cir. 1965), affg. a Memorandum Opinion of this Court. "To meet his burden of proof, the Commissioner need not prove the precise amount of *568 the underpayment resulting from fraud, but only that 'any part' of the underpayment is attributable to fraud." Plunkett v. Commissioner, 465 F.2d 299, 303 (7th Cir. 1972), affg. a Memorandum Opinion of this Court. If an part of a deficiency is due to fraud the 50-percent addition to tax imposed by section 6653(b) is applied to the entire deficiency, not just the part produced by fraud. And if a part of the underpayment of tax for any year was due to fraud, there is no statutory time limit on the collection of the deficiencies and additions to tax for that year. Sec. 6501(c)(1). Stone v. Commissioner, 56 T.C. 213 (1974). The term "fraud" has been defined as-- actual intentional wrongdoing, and the intent required is the specific purpose to evade tax believed to be owing. Fraud implies bad faith, intentional wrongdoing, and a sinister motive. It is never imputed or presumed and the courts will not sustain findings of fraud upon circumstances which at most create only suspicion. * * * [Cits. omitted]. [Ross Glove Co. v. Commissioner, 60 T.C. 569, 608 (1973).] The existence of fraud is a factual question, Estate of Hollis R. Temple v. Commissioner, 67 T.C. 143, 159 (1976), and *569 reference must be made to the entire record. Otsuki v. Commissioner, 53 T.C. 96, 105-106 (1969). As noted in Stone v. Commissioner, supra at 224: Generally, the evidence of fraudulent intent must be gleaned by surveying the whole course of conduct of the taxpayer with respect to the transactions in question. Although fraud is never to be imputed or presumed, its proof may depend to some extent upon circumstantial evidence, and may rest upon reasonable inferences properly drawn from the evidence of record * * *. Furthermore, we are entitled to consider the entire record to find evidence of fraud, and we are not limited to the respondent's affirmative evidence. [Cits. omitted.] As discussed above, respondent has clearly shown that petitioners' bank deposits and cash expenditures significantly exceeded the income reported on their returns for each of the years in issue, that petitioners had a taxable source for the unreported income, and that petitioners had no nontaxable source for most of the unreported income unless we accept petitioners' explanation that they had a cash hoard of $ 125,000 on hand at the beginning of 1969 which was all funneled into the bank accounts in the next *570 3 years. For the reasons discussed above and hereinafter, we do not accept petitioners' explanation. But petitioners' failure to prove error in respondent's determination of deficiencies is not enough, alone, to prove fraud. Estate of Beck v. Commissioner, 56 T.C. 297, 363 (1971). Respondent must introduce evidence that the bank deposits and other cash expenditures were derived from currently taxable income which was fraudulently omitted from petitioners' income. Drinkhouse v. Commissioner, 225 F.2d 874 (2d Cir. 1955), affg. a Memorandum Opinion of this Court. The necessary proof may come from evidence which affirmatively shows a "likely" taxable source for the bank deposits and cash expenditures. As the Supreme Court explained in Holland v. United States, 348 U.S. 121, 137-138 (1954), in connection with a net worth case: Increases in net worth, standing alone, cannot be assumed to be attributable to currently taxable income. But proof of a likely source, from which the jury could reasonably find that the net worth increases sprang, is sufficient * * *. This is not to say that the Government may disregard explanations of the defendant reasonably susceptible of being checked. *571 But where the relevant leads are not forthcoming, the Government is not required to negate every possible source of nontaxable income, a matter peculiarly within the knowledge of the defendant. * * * The necessary proof may also come from evidence negating all nontaxable sources. United States v. Massei, 355 U.S. 595 (1958). "[S]hould all possible sources of nontaxable income be negatived there would be no necessity for proof of a likely source." United States v. Massei, supra.
Viewing the evidence as a whole, we are convinced that the bank deposits and cash expenditures were, at least in part, attributable to currently taxable income which Carl fraudulently failed to report. The first category of respondent's proof, evidence indicating the absence of any nontaxable source for the bank deposits and cash expenditures, reasonably negates the existence of any such source which would account for all the amounts in question. Petitioners did not receive any large gifts, inheritances, or insurance proceeds during the years in issue which would account in substantial part for the bank deposits and cash expenditures. Nor during prior years were any such amounts received which were saved *572 and available during 1969-1971. As previously discussed, there is no credible evidence that petitioners had a cash hoard in sufficient quantity to account for all the bank deposits and cash expenditures. To affirmatively show a likely taxable source for the bank deposits and cash expenditures, respondent points to the large amount of the bank deposits and currency expenditures in issue, to the fact that they were all in cash, and to the existence of a taxable potential source for the funds which Carl controlled, as collectively leading to the conclusion that Carl omitted taxable gross receipts from income for the years in issue. [17]
*573 Set forth in the Findings of Fact is a chronology of the cash expenditures for which sources could not be specifically identified. The pattern of deposits and expenditures throughout the years involved suggests a fund's source such as the Retreat which would not only generate cash but also generate it on a recurring basis. Moreover, Carl performed the initial, crucial step of recording in the day book the amount of cash received after which he destroyed the cash-register tapes, the only possibly accurate record of the amount of cash received by the Retreat. Thus, there is no means by which to check directly the accuracy of the figures Carl recorded in the day book. As a cash business the Retreat certainly provided a potential source of unreported cash funds and Carl's control of the gross receipts and maintenance of the day book in which were recorded the gross receipts amounts provided an opportunity to obtain cash without leaving a conspicuous record. Petitioners claim that the absence of any proof that the Retreat would have generated the gross receipts in question precludes a conclusion that there was an omission of gross receipts. Although the introduction of such evidence *574 as gross profit statistics for a business such as the Retreat may have strengthened respondent's case, its absence does not lead to the result sought by petitioners. There is also no evidence that the Retreat could not have generated the amounts in question. It must be remembered that respondent need only prove that some part of an omission from income and the resulting deficiency was fraudulent. Plunkett v. Commissioner, supra.Moreover, he need only prove that a likely taxable source existed for the omitted income. Holland v. United States, supra.Thus, in order to prevail it is not necessary for respondent to establish that all of the bank deposits and cash expenditures are attributable to the Retreat. He need only show by clear and convincing evidence that the likely source of some of these items was unreported gross receipts of the Retreat and that the failure to include them in income was fraudulent. We believe respondent has met that burden. Although the greater part of respondent's case may have been the negation of nontaxable sources for the bank deposits and cash expenditures, this evidence together with the affirmative evidence of Carl's control of the depositing and *575 reporting of gross receipts leads us to the conclusion that unreported gross receipts of the Retreat were a likely source for the cash items. The willful evasion of tax may be inferred when a taxpayer has made "numerous and comparatively large deposits in a bank account, the sources and nature of which are not recorded or accounted for in any books of account." Jones v. Commissioner, 29 T.C. 601, 613 (1957); see also Goe v. Commissioner, 198 F.2d 851 (3d Cir. 1952), cert. denied 344 U.S. 897 (1952), affg. a Memorandum Opinion of this Court. Certainly, that situation exists herein. In this case the existence of an understatement of taxable income giving rise to a deficiency and the existence of fraud are inseparable, there being no middle ground whereby it could be concluded that an understatement and deficiency existed but that fraud did not. The Retreat's gross receipts reported on petitioners' returns were based on figures contained in the formal books prepared by Kugelman, which books, in turn, were based in part on the day book in which Carl recorded the Retreat's gross receipts. Any inaccuracy in the day book figures must be traced to Carl since he solely maintained the day *576 book. The skimming of gross receipts by Carl could only have been with the intent to evade tax. Skimmed amounts were not recorded as gross receipts. A potential record of their existence, the cash register tapes, was destroyed, and the receipts were channeled into different bank accounts. Moreover, the existence of these bank accounts was not voluntarily disclosed. The only reasonable inference from these facts is that Carl intended to evade taxes due by not reporting all the Retreat's gross receipts. In summary, we conclude that Carl fraudulently omitted gross receipts from petitioners' returns for each of the years in issue with intent to evade tax, and that the underpayment of tax for each of those years was due to fraud. Accordingly, the statute of limitations does not bar the assessment of deficiencies for any of the years 1969, 1970, or 1971; and the additions to tax for each of those years under section 6653(b) is approved. [18]
Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable years in issue.↩
2. Other minor adjustments made in the statutory notice of deficiency were not disputed at trial.↩
3. Respondent has conceded the question of fraud with regard to petitioner Betty Carl. ↩
5. By agreement of the parties, see sec. 6501(c)(4), the sec. 6501(e)(1) 6-year period for assessment did not expire for petitioners' taxable year 1969 until Dec. 31, 1976. Thus, mailing of the statutory notice on Dec. 21, 1976, was within the 6-year period for 1969.
5. Respondent has conceded that sec. 6501(e)(1)↩ is not applicable to petitioners' taxable year 1971.
6. In the statutory notice of deficiency, respondent allowed petitioners a loss of $ 73.50 with respect to the partnership interest for 1970.↩
7. Petitioners and respondent disagreed as to the amount Carl received by redeeming savings bonds, petitioners claiming the amount was at least $ 2,000 and respondent claiming it was $ 738.15. It is unnecessary to the disposition of this case to make a finding as to the correct amount.↩
1. The incompleteness of some of the figures is due to the quality of the copy of the return introduced into evidence.↩
8. The $ 38,836.17 figure was the total of the "excess" cash amounts, $ 6,554.01 (1969), $ 18,283.18 (1970), and $ 13,998.98 (1971), which Carl could not explain by reference to specific transactions or items which could be listed on the separate sheets. The $ 30,500 figure was composed of $ 18,000 in savings (15 years X $ 1,200 per year), $ 6,000 from the sale of a business, and $ 6,500 from investments. No explanation was provided for the difference between the $ 38,836.17 and the $ 30,500 amounts.↩
9. At trial and on brief, respondent contended that Carl also had unreported gambling winnings.↩
10. As a point of reference, the figures initially determined by the New York State auditor as omitted income for the 3 years were $ 36,967, $ 44,867.55, and $ 38,370.26, respectively.↩
11. The stipulation of facts shows a deposit of $ 3,000 for July 14, 1969. The underlying documents on which the stipulation is based, however, record a $ 4,000 deposit and we have used that figure. Cashier's check.
[1]↩ Cash deposits.
12. Petitioners reported greater amounts of interest income on their returns than shown in respondent's calculation. However, since these greater amounts apparently were not included in bank deposits, it was not necessary to exclude them as reported amounts in determining unreported gross receipts.
1. BD-Bank Deposit; CC-Cashier's Check; CD-Certificate of Deposit; TC-Treasurer's Check. 2. Unidentified payment.↩
13. This is in conflict with the report of the Probate Court handling Carl's father's estate, which reported personal property not in excess of $ 50,000 and real property not in excess of $ 20,000.↩
14. For example, we cannot tell whether the nontaxable portion of capital gains was eliminated from income. ↩
15. We hasten to add that we think it highly unlikely that the Retreat generated losses or such small net profits as reported on petitioners' returns for the years involved and preceding years.↩
16. On brief respondent framed the issue of fraud in terms of whether under section 6501(c)(2) there was a "willful attempt in any manner to defeat or evade tax." Sec. 6501(c)(2) by its terms, however, does not apply to a tax imposed by subtitle A or B (income, estate, and gift taxes). Accordingly, sec. 6501(c)(2) has no application to the instant dispute concerning income taxes. The applicable provision would be sec. 6501(c)(1).
Although both parties made reference to the incorrect code section, the parties substantively argued their respective positions as if sec. 6501(c)(1)applied. Indeed, with the exception that sec. 6501(c)(1) applies to returns, it is difficult to articulate a meaningful distinction between "false or fraudulent return with the intent to evade tax" and "willful attempt in any manner to defeat or evade tax." Under these circumstances we can perceive of no prejudice to petitioners in terms of the presentation of their case by our consideration of the facts presented against the backdrop of sec. 6501(c)(1)↩ and we have accordingly done so.
17. Respondent also claimed that Carl had unreported gambling winnings. The evidence on this point, being merely some statements by Carl, is so vague and inclusive that, bearing in mind respondent's burden of proof, it could not be reasonably found that any such winnings existed. Moreover, the whole focus of respondent's reconstruction of income was a comparison of reported gross receipts with the amount respondent determined should have been reported. Accordingly, we will focus on respondent's argument that the Retreat's gross receipts were underreported.↩
18. Having reached this conclusion, we need not address the possible application of sec. 6501(e)↩.